**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OMAR ABUROMI, et al., | |
| Plaintiffs, | 24 Civ. 5646 (JPC) (GS) |
| -against- | **REPORT AND** |
| BANK OF BEIRUT AND THE ARAB COUNTRIES, et al., | **RECOMMENDATION** |
| Defendants. | |

**GARY STEIN, United States Magistrate Judge:**

Plaintiffs Omar Aburomi, Ihab Abbas, Sarah Y. Baddour, Fleta Cousin-Sabra, Abdullatif Sabra, and Abdulkareem Qandeel (collectively, "Plaintiffs"), proceeding *pro se*, commenced this action on July 23, 2024.  (Dkt. No. 1).  Defendant Citibank, N.A. ("Citibank") has moved to dismiss the claims asserted against it in Plaintiffs' Second Amended Complaint.  (Dkt. No. 56).  For the reasons set forth below, this Court recommends that Citibank's motion be **GRANTED**.[1]

## BACKGROUND

### A.  Plaintiffs' Allegations

The following facts, drawn from Plaintiffs' Second Amended Complaint (Dkt. No. 6 ("Complaint" or "Compl.")), are taken as true for the purposes of this motion to dismiss.  *See Horn v. Stephenson*, 11 F.4th 163, 166 (2d Cir. 2021).[2]

---

[1] On February 24, 2025, the Honorable John P. Cronan referred this matter to the undersigned for general pretrial supervision and dispositive motions requiring a report and recommendation.  (Dkt. No. 33).

[2] The Complaint's allegations are not presented in chronological order and at times it is difficult to discern when events are alleged to have taken place.  The Court has tried its best to construct a coherent narrative based on Plaintiffs' allegations.

Plaintiffs bring this suit against, *inter alia*, Defendant Bank of Beirut and the Arab Countries ("BBAC") and Citibank, a correspondent bank for BBAC.  At its core, the Complaint alleges that Plaintiff Abbas was unable to withdraw or transfer funds in his BBAC account to pay the other Plaintiffs for precious gems he purchased from them, and that his account thereafter was restricted.  (Compl. at 1–2).  Plaintiffs assert claims under the federal antitrust laws and other causes of action, seeking to recover millions of dollars in funds in Abbas's account at BBAC as well as damages.

On or about August 25, 2017, Abbas opened a U.S. dollar savings account with BBAC in Lebanon, his country of residence, and deposited substantial sums into the account.  (Compl. ¶¶ 1, 123–25, 163, 178).  In July 2018, Abbas attempted to conduct a wire transfer from Lebanon to payees in the United States.  (*Id.* ¶¶ 26, 27, 127).  Abbas was advised by BBAC management that the transaction would take up to one month to process, but that it could be more easily facilitated through a correspondent bank in the United States.  (*Id.*).  Either then or at another time, a manager at BBAC advised Abbas that if he wanted to invest in gems in the United States, "it would be better to complete the transaction in the United States."  (*Id.* ¶ 160; *see also id.* ¶ 179 (alleging that instead of processing a wire transfer, "BBAC insisted [Abbas] wait to enter the United States")).

At some point before July 2019, Abbas purchased emeralds and diamonds from Plaintiffs Baddour, Cousin-Sabra, Qandeel, and Aburomi, a group of sellers who live in the United States.  (*Id.* ¶¶ 1, 26, 127, 138, 140, 157, 161).  To pay for the

2

gems, he wrote a check on his BBAC account in the amount of $2.5 million payable to Cousin-Sabra and Baddour. (*Id.* ¶¶ 26, 127, 158). Abbas met up with Cousin-Sabra and Baddour in the United States and the three headed for New York, apparently because they understood Citibank was one of BBAC's correspondent banks in the United States. (*Id.* ¶¶ 128, 140, 157).

On July 4, 2019, Abbas, accompanied by Cousin-Sabra and Baddour, entered a Citibank location in downtown Manhattan and attempted to initiate a transaction with the $2.5 million check. (*Id.* ¶¶ 127, 140, 158, 159).[3] After waiting for an hour, they were told to come back the following day due to the large amount of money involved. (*Id.* ¶ 159). They returned approximately four days later. (*Id.* ¶ 162). A Citibank official insisted that Cousin-Sabra and Baddour open accounts at Citibank. (*Id.*). Plaintiffs regarded this suggestion as "impractical," as the sellers were already banking with another institution. (*Id.*). Abbas also did not have an account with Citibank. (*Id.* ¶ 163).[4]

Nevertheless, Plaintiffs allege that, because Abbas had a U.S. dollar account at BBAC and "Citibank was a correspondent bank" for BBAC, Abbas had a "lawful right to receive funds from Citibank" and "Citibank had a duty to specifically

---

[3] Certain paragraphs of the Complaint allege that Abbas sought to "cash [the] check." (*Id.* ¶¶ 140, 158). Elsewhere, the Complaint alleges that Abbas requested that "the funds be transferred from Citibank to an account at Bank of America." (*Id.* ¶ 159; *see also id.* ¶¶ 172, 180 (referring to the requested transaction as a "transfer")). The Court regards the latter scenario as more likely and does not take literally the references to "cash[ing]" the check.

The Court also is skeptical that the encounter at the Citibank location took place, as alleged, on July 4, 2019, a date when banks are ordinarily closed in observance of the federal holiday. But the date of the encounter is not material to the Court's analysis.

[4] Abbas returned to Citibank again later in July with another of the sellers, Plaintiff Qandeel, to no avail. (*Id.* ¶ 182).

perform the transfer of funds," which it failed to discharge.  (*Id.* ¶¶ 163, 172, 173).

Plaintiffs also allege that, in going to Citibank, Abbas was following BBAC's advice,

yet "neither Citibank nor BBAC seemed willing to provide the money needed to pay

the sellers of the gems," even though he had submitted "all required documents."

(*Id.* ¶ 161).

Subsequently, since August 2019, BBAC has effectively held Abbas's account

hostage, preventing him from closing the account, withdrawing any money from the

account, or otherwise exercising any control over the account.  (*Id.* ¶¶ 203–09).  The

account had approximately $3.6 million in it as of November 2023.  (*Id.* ¶ 126).

Plaintiffs allege that Abbas's funds were converted and/or fraudulently transferred

by BBAC to Defendant Assaf Holding Company SAL ("Assaf"), BBAC's majority

shareholder.  (*Id.* ¶¶ 45, 215–67).

The Complaint assert six causes of action for (1) violations of Section 1 of the

Sherman Antitrust Act, 15 U.S.C. § 1, (2) conversion, (3) fraudulent conveyance

under New York Debtor Creditor Law ("NYDCL") § 273, (4) fraudulent conveyance

under NYDCL § 274, (5) attachment, and (6) special damages.[5]  (*Id.* ¶¶ 210–95).

## B. Procedural History

Plaintiffs initially filed this action on July 23, 2024.  (Dkt. No. 1).  In that

complaint, Plaintiffs brought the same causes of actions as their operative

complaint based on the same underlying facts, while including additional causes of

action for punitive damages and attorneys' fees and costs.  (*Id.* ¶¶ 271–81).  On

---

[5] As discussed *infra*, not all of these claims present viable causes of action under law.

4

October 11, 2024, prior to the issuance of any summonses, Plaintiffs amended their complaint to remove the causes of action for punitive damages and attorneys' fees. (Dkt. No. 2).  On October 25, 2024, Plaintiffs filed their Second Amended Complaint, the operative complaint, which is identical to the first amended complaint, but attaches additional exhibits.  (Dkt. No. 6).  Plaintiffs sought and were granted leave to proceed *in forma pauperis*.  (Dkt. Nos. 10–15, 25–30).

The Second Amended Complaint names as Defendants BBAC; Assaf; Citibank; J.P. Morgan Chase Bank N.A. ("Chase"), another correspondent bank for BBAC; and Fransabank SAL ("Fransabank"), another large shareholder of BBAC. (Compl. p. 1 and ¶ 47; Dkt. No. 32 at 1–2).  Plaintiffs voluntarily dismissed their claims against Chase in May 2025.  (Dkt. Nos. 43, 45).  So far as the docket reflects, Plaintiffs have not effected service on Fransabank (Dkt. Nos. 32, 36, 50, 53).  BBAC and Assaf have separately moved to dismiss on grounds of lack of diversity jurisdiction, lack of personal jurisdiction, *forum non conveniens*, and improper service.  (Dkt. No. 71).

On June 17, 2025, Citibank sought leave to file a motion to dismiss Plaintiffs' Second Amended Complaint.  (Dkt. No. 49).  On June 20, 2025, Judge Cronan ordered the Plaintiffs to inform the Court whether they agreed to the briefing schedule set forth in Citibank's letter, or whether they proposed an alternative briefing schedule.  (Dkt. No. 50).  Plaintiffs did not respond.  Accordingly, Citibank sought leave from this Court for approval of a substantially similar briefing schedule.  (Dkt. No. 51).  This Court approved the proposed schedule that same day,

advising Plaintiffs that they could either respond to Citibank's motion or file an amended complaint, but that if they did neither, the Court would treat Citibank's motion as unopposed.  (Dkt. No. 52).

Citibank filed its present motion on July 14, 2025 (Dkt. No. 56), accompanied by a memorandum of law (Dkt. No. 57 ("Def. Br.")).  Despite making other filings on the docket since that time, including an opposition brief to BBAC and Assaf's separate motion to dismiss (Dkt. Nos. 59, 65, 75), Plaintiffs did not file an opposition of any kind to Citibank's motion.  Citibank, accordingly, requests that its motion be treated as unopposed.  (Dkt. Nos. 64, 77).

## LEGAL STANDARDS

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* The factual allegations "must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 (complaint must raise "more than a sheer possibility that a defendant has acted unlawfully").

In considering a motion to dismiss under Rule 12(b)(6), the Court must

6

"accept[] all factual allegations in the complaint as true" and "draw[] all reasonable inferences in the plaintiff's favor." *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (citation omitted). Courts need not, however, consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (citation omitted); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Determining whether a plausible claim has been pled is "a context-specific task" that requires the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 113 (2d Cir. 2023). However, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Twombly*, 550 U.S. at 556 (citation omitted). "[T]he court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side[.]" *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).

A plaintiff's failure to oppose a motion to dismiss "cannot itself justify dismissal of a complaint," as "'the sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law.'" *Haas v. Commerce Bank*, 497 F. Supp. 2d 563, 564 (S.D.N.Y. 2007) (quoting *McCall v. Pataki*, 232 F.3d 321, 322 (2d Cir. 2000)). Moreover, "[i]t is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they

suggest." *Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020).[6]

## DISCUSSION

Of the six causes of action in the Complaint, Citibank acknowledges, and the Court agrees, that Plaintiffs' antitrust claim is asserted against Citibank. (Compl. ¶¶ 210–14; *see* Def. Br. at 5). By contrast, Plaintiffs' three claims for conversion and fraudulent conveyance are asserted only against BBAC and Assaf, and so Citibank does not move to dismiss those claims. (Compl. ¶¶ 215–67). The status of Plaintiffs' remaining claims for attachment and special damages (*id.* ¶¶ 268–95) is less clear, as discussed below.

In addition, the Complaint contains allegations accusing Citibank of wrongfully refusing to honor the $2.5 million check presented by Abbas and execute the funds transfer he requested. (*See, e.g., id.* ¶¶ 140, 147, 172 (alleging that Citibank "failed to honor the check"), ¶ 147 (alleging that Citibank "wrongfully dishonored conforming documents presented by" Plaintiffs)). Citibank's brief acknowledges the possibility that the Complaint could be read to assert such a claim. (Def. Br. at 9 n.3). The Court therefore construes the Complaint liberally to assert a claim for wrongful dishonor, even though no such cause of action is specifically pleaded. *See Ransom v. Banks*, No. 20 Civ. 10232 (MKV), 2022 WL

---

[6] The Complaint indicates that Plaintiff Cousin-Sabra is a licensed attorney (though not in the state of New York), and its opening paragraph states that Plaintiffs are bringing this action "by and through their undersigned attorney Fleta Cousin-Sabra." (Compl. at 1 and 44). However, Cousin-Sabra has filed no notice of appearance, or motion to appear *pro hac vice*. Although "a court is not obligated" to afford special solicitude "where the *pro se* plaintiff is a licensed attorney," *Smith v. City of New York*, No. 15 Civ. 4493 (RJS), 2016 WL 4574924, at *3 (S.D.N.Y. Sept. 1, 2016), this Court chooses to do so under the circumstances here and will treat the Complaint as a *pro se* pleading despite Cousin-Sabra's involvement.

769344, at *6 (S.D.N.Y. Mar. 14, 2022) (*pro se* complaint must be construed "liberally to raise all claims possible").

The Court thus analyzes below whether Plaintiffs may maintain a claim against Citibank for violation of the antitrust laws, wrongful dishonor, special damages, and attachment.

## A. Plaintiffs' Antitrust Claim

Citibank argues that Plaintiffs' antitrust claim against it should be dismissed (1) because it is barred by the applicable statute of limitations and (2) because Plaintiffs have not pled sufficient facts to state an antitrust claim. (Def. Br. at 8–13). The Court agrees, on both counts.

### 1. Timeliness

While "'the lapse of a limitations period is an affirmative defense that a defendant must plead and prove . . . a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint.'" *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)). A district court "may dismiss a claim on statute-of-limitations grounds at the pleadings stage 'if [the] complaint clearly shows the claim is out of time.'" *Id.* (quoting *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999)). After review of the Complaint, the Court finds that Plaintiffs' antitrust claim must be dismissed as untimely.

Plaintiffs' first listed cause of action alleges a violation of Section 1 of the

Sherman Antitrust Act, 15 U.S.C. § 1.[7]  (Compl. ¶ 211 and at 43).  Plaintiffs allege

that Defendants "entered into and engaged in a conspiracy to unreasonably restrain

trade" through their control and restriction of access to Abbas's funds, which

constitutes a "per se violation of federal antitrust laws and an unlawful and

unreasonable restraint on commerce" which harmed Plaintiffs.  (*Id.* ¶¶ 210–14).

Citibank argues that the Sherman Act claim is subject to a four-year statute

of limitations running from the date of injury.  (Def. Br. at 8–9).  Given that

Plaintiffs allege that they were injured by Citibank in July 2019 through its refusal

to honor Abbas's requested withdrawal, and Plaintiffs did not file suit until July 23,

2024, Citibank contends that Plaintiffs are time-barred from proceeding with their

Sherman Act claim against Citibank.  (*Id.*).

Under the Sherman Act, a plaintiff must file suit within four years after a

cause of action accrues.  15 U.S.C. § 15b.  An antitrust cause of action generally

"accrues and the statute begins to run when a defendant commits an act that

injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401

U.S. 321, 338 (1971).  "When an antitrust injury is caused [by] a single injurious

act, the statute of limitations runs from that act, even if the resulting injury

continues over a prolonged period." *Rite Aid Corp. v. Am. Express Travel Related

Servs. Co.*, 708 F. Supp. 2d 257, 267 (E.D.N.Y. 2010) (citing *Zenith*, 401 U.S. at 338–

39), *abrogated on other grounds by US Airways, Inc. v. Sabre Holdings Corp.*, 938

---

[7] Plaintiffs' cause of action also cites Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, which allows private parties to sue under the federal antitrust laws, including the Sherman Act. *Agency Dev., Inc. v. Med Am. Ins. Co.*, 310 F. Supp. 2d 538, 543 (W.D.N.Y. 2004).

F.3d 43 (2d Cir. 2019).  This rule will not bar a claim where the defendant engages in "conduct which constitute[s] a continuing violation of the Sherman Act and which inflict[s] continuing and accumulating harm."  *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502 n.15 (1968).  In such a case, "each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again."  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (internal quotations omitted).

The Second Circuit has made clear that "[a]n overt act that restarts the statute of limitations is characterized by two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff."  *US Airways*, 938 F.3d at 68 (internal quotations omitted).  Applying this rule, courts have found that the following acts do not constitute overt acts that restart the limitations period: the annual re-signing of allegedly coercive contracts without compensation (*see Chalmers v. Nat'l Collegiate Athletic Ass'n*, No. 25-1307-cv, 2025 WL 3628416, at *4 (2d Cir. Dec. 15, 2025)); the subsequent sale of intellectual property rights at a lower price due to a defendant's anticompetitive behavior (*see SL-x IP S.a.r.l. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, Nos. 21-2697, 21-2699, 2023 WL 2620041, at *3 (2d Cir. Mar. 24, 2023)); and the artificial suppression of wages after the initial anticompetitive employment contract was signed (*see Giordano v. Saks Inc.*, 654 F. Supp. 3d 174, 192 (E.D.N.Y. 2023), *aff'd sub nom. Giordano v. Saks & Co. LLC*, No. 23-600-cv, 2025 WL 799270 (2d Cir. Mar. 13, 2025)).

Here, Plaintiffs allege that in July 2019, Citibank refused to accept Abbas's check and transfer the funds. (Compl. ¶¶ 158–59, 162, 182). The Complaint does not allege any act by Citibank after that date. Further, to the extent Plaintiffs allege that Citibank colluded with BBAC in restricting Abbas's access to his BBAC account (though no facts are alleged to suggest Citibank did so), the Complaint alleges that BBAC restricted Abbas's account beginning in August 2019. (Compl. ¶¶ 203–05). Plaintiffs did not file this action until July 2024, well more than four years after these allegedly injurious acts.

Even if the Complaint could be generously read as alleging a continuing violation, Plaintiffs' Sherman Act claim would still be untimely. Assuming Plaintiffs allege that Citibank and the other Defendants coordinated to restrict Plaintiffs' access to Abbas's funds from 2019 until present in violation of federal antitrust law, this would merely reflect a reaffirmation of the initial act that did not inflict new and accumulating injury on Plaintiffs. Indeed, Plaintiffs make no attempt to allege what other injury might have befallen them from the alleged unlawful agreement between BBAC and Citibank.

"Courts within the Second Circuit 'consistently have looked unfavorably on continuing violation arguments' and have found that 'compelling circumstances must exist before the limitations period will be extended.'" *Giordano*, 654 F. Supp. 3d at 194 (quoting *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 228 (E.D.N.Y. 2003)). "Statutes of limitations are designed to encourage plaintiffs 'to pursue diligent prosecution of known claims.'" *Cal. Pub. Emps.' Ret.*

12

*Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 504 (2017) (quoting *CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014)).  "This is especially true in cases—such as those that are brought under the Sherman Act—where Congress has provided for treble damages." *Giordano*, 654 F. Supp. 3d at 194 (collecting cases).  Plaintiffs here allege no circumstances warranting extending the limitations period.  Accordingly, Plaintiffs' federal antitrust claim against Citibank should be dismissed as untimely.

### 2.  Sufficiency of Plaintiffs' Allegations

"To state a claim under Section One of the Sherman Act (and Clayton Act §§ 4, 16), [a] [p]laintiff must allege sufficient facts to plausibly establish that (i) [d]efendants entered into a contract, combination, or conspiracy that (ii) unreasonably restrained competition or trade (iii) in the relevant market and (iv) caused [p]laintiff to suffer an antitrust injury." *TechReserves Inc. v. Delta Controls Inc.*, No. 13 Civ. 752 (GBD), 2014 WL 1325914, at *4 (S.D.N.Y. Mar. 31, 2014) (citing *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 103 (2d Cir. 2000)).  Citibank argues that Plaintiffs fail to allege facts sufficient to support any of these four prongs.

Specifically, Citibank argues that Plaintiffs allege no facts sufficient to show that it entered into a conspiracy or other unlawful agreement with any other Defendant here, and that Citibank's mere status as a correspondent bank is insufficient to meet this threshold.  (Def. Br. at 9–11).  Further, Citibank maintains that Plaintiffs do not allege any unreasonable restraint on competition or trade.  (*Id.* at 11).  Third, Citibank argues that Plaintiffs do not allege a relevant market in

which Citibank would be causing competitive harm.  (*Id.* at 11–12).  Finally,

Citibank contends that Plaintiffs fail to allege antitrust standing, as they do not

allege any "special" injury or show that they are suitable plaintiffs to bring such a

claim, even if one existed.  (*Id.* at 12–13).

"An antitrust plaintiff can overcome a motion to dismiss in two ways." *In re*

*Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019).

"First, a plaintiff may, of course, assert direct evidence that the defendants entered

into an agreement in violation of the antitrust laws.  Such evidence would consist,

for example, of a recorded phone call in which two competitors agreed to fix prices

at a certain level." *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d

129, 136 (2d Cir. 2013) (internal citation omitted).  Alternatively, a complaint may

allege "'conscious parallelism, when such interdependent conduct is accompanied by

circumstantial evidence and plus factors.'" *Id.* (quoting *Todd v. Exxon Corp.*, 275

F.3d 191, 198 (2d Cir. 2001)).  Plus factors may include facts such as "a common

motive to conspire, evidence that shows that the parallel acts were against the

apparent individual economic self-interest of the alleged conspirators, and evidence

of a high level of interfirm communications.  Generally, however, alleging parallel

conduct alone is insufficient, even at the pleading stage." *Id.* (internal quotations

omitted).  Plaintiffs allege no direct evidence here, and must instead rely on a

conscious parallelism approach.

An antitrust complaint that "fail[s] to connect each or any individual entity to

the overarching conspiracy, or[,] alternatively, satisf[ies] the requirements for

imputing another affiliated entity's liability" cannot ordinarily survive a motion to dismiss. *Concord Assocs., L.P. v. Ent. Props. Tr.*, No. 12 Civ. 1667 (ER), 2014 WL 1396524, at \*20 (S.D.N.Y. Apr. 9, 2014).  Allegations about the defendants "as a general collective bloc, or generalized claims of parallel conduct, must . . . be set aside . . . as impermissible group pleading." *In re Interest Rate Swaps Antitrust Litig.*, No. 16 MD 2704 (PAE), 2018 WL 2332069, at \*15 (S.D.N.Y. May 23, 2018). Moreover, the circumstances alleged "must reveal 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)).  Merely pleading "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).  Plaintiffs must present evidence "that tends to exclude the possibility that the alleged conspirators acted independently." *Id.* (internal quotations omitted).

Plaintiffs fail to meet this standard for alleging an antitrust conspiracy. Plaintiffs' own allegations (*see* Compl. ¶¶ 26, 28, 36, 77, 78, 85, 128–30) do not indicate that Citibank's relationship with BBAC was anything other than a standard correspondent banking relationship. *See United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 115 (1975) (discussing correspondent banking relationships and finding no Sherman Act violation for "conventional correspondent arrangements").  Plaintiffs' conspiracy allegations are entirely conclusory and do

not even suggest conscious parallel conduct, let alone allege any of the "plus factors" required under law, or any other form of unlawful anticompetitive agreement. (*See* Compl. ¶¶ 170 (alleging that "Citibank conspired with BBAC to take] advantage of the economic chaos"), 211 & 213 (boilerplate "conspiracy" allegations). Accordingly, as Plaintiffs fail to plausibly allege an impermissible "contract, combination, or conspiracy," their antitrust claim must be dismissed.

Moreover, Plaintiffs fail to allege facts showing any unreasonable restraint on competition or trade. To satisfy this element of a Sherman Act claim, plaintiffs "may either plead that the alleged concerted action was *per se* illegal under Section 1 of the Sherman Act, or that the conduct violated what is known as the "'rule of reason.'" *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 324 (S.D.N.Y. 2018). Plaintiffs do not allege any *per se* unlawful conduct, which "involve[s] 'categorically unreasonable restraints on trade' due to 'their inherently anticompetitive nature,'" such as price-fixing. *Mbadiwe v. Amazon.com, Inc.*, No. 22 Civ. 9542 (VSB), 2025 WL 2675937, at *7 (S.D.N.Y. Sept. 18, 2025) (quoting *United States v. Aiyer*, 33 F.4th 97, 114 (2d Cir. 2022)).

"Under rule-of-reason analysis, to sufficiently plead an unreasonable restraint on trade, the plaintiff must allege facts that describe the challenged restraint, the contours of the relevant market, the anticompetitive effects the restraint has on that market, and an injury suffered by the plaintiff that the antitrust laws were intended to prevent and that flows from that which makes the restraint unlawful." *Mooney v. AXA Advisors, L.L.C.*, 19 F. Supp. 3d 486, 498

16

(S.D.N.Y. 2014).  Plaintiffs do not allege even the basic facts required: whether and how any restraint of trade led to anticompetitive effects in a relevant market. Plaintiffs' allegations only hint at the unreasonable restraint prong in three instances, all in conclusory fashion.  (Compl. ¶¶ 211, 213 and at 43).

At most, Plaintiffs suggest that Defendants restrained trade by "suppressing the accounts at issue," *i.e.*, by restricting Abbas's access to his account at BBAC. (*Id.* ¶ 213).  But "[t]o allege unreasonable restraint of trade, something more than a private dispute must be alleged." *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 58 F. Supp. 2d 228, 237 (S.D.N.Y. 1999).  Citibank's refusal to honor a check or process a requested transaction for one individual falls far short of pleading an unreasonable anticompetitive effect in a relevant market violative of the rule of reason.  Accordingly, Plaintiffs' claim must be dismissed under this prong as well.

Finally, Plaintiffs fail to plead antitrust injury.  *See Gatt Commc'ns, Inc. v. PMC Assocs.*, 711 F.3d 68, 75 (2d Cir. 2013) (to survive a motion to dismiss, a plaintiff must establish antitrust standing by plausibly alleging "(a) that it suffered 'a special kind of "antitrust injury,"' and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws" (quoting *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121–22 (2d Cir. 2007))).  "Antitrust injury is more than just a personal injury." *World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 425 F. Supp. 2d 484, 519 (S.D.N.Y. 2006) (citing *Arnold Chevrolet LLC v. Tribune Co.*, 418 F. Supp. 2d 172, 180 (E.D.N.Y. 2006)), *aff'd*, 328 F. App'x 695 (2d Cir. 2009).  "Rather, in order to establish

17

antitrust injury, the plaintiff must demonstrate that its injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] defendants' acts unlawful.'" *Gatt Commc'ns, Inc.*, 711 F.3d at 76 (quoting *Daniel v. American Bd. of Emergency Med.,* 428 F.3d 408, 438 (2d Cir. 2005)).

Plaintiffs' allegations establish only individual economic harm.  This is not enough.  *See, e.g.*, *Spinelli v. NFL,* 96 F. Supp. 3d 81, 109 (S.D.N.Y. 2015) (finding no antitrust injury where "[p]laintiffs' alleged injury amounts to personal economic loss," not an "adverse effect on competition or consumers") (citation omitted); *Greene v. Conn. Bd. of Acct.,* No. CIVA3:00CV599 (CFD), 2001 WL 286855, at *4 (D. Conn. Mar. 20, 2001) ("Here, although the defendants' concerted actions may have prevented the plaintiff from participating in the audit bidding process, they did not result in injury to the market as a whole.  Consequently, [plaintiff] has not alleged an 'antitrust injury.'  Her injury can only be characterized as personal, and thus not sufficient under Section 1.") (internal citation omitted).  Accordingly, Plaintiffs do not establish the requisite antitrust injury to assert antitrust standing.

Due to these multiple pleading defects, the Court recommends that Plaintiffs' antitrust claim be dismissed.[8]

## B.  Plaintiffs' Wrongful Dishonor Claim

Anticipating the Court's reading of Plaintiffs' Complaint as asserting a claim

---

[8] As the Court has found numerous reasons that Plaintiffs' antitrust claim requires dismissal, it is unnecessary to reach the issues of whether Plaintiffs have adequately alleged the second prong of antitrust standing (*i.e.*, that Plaintiffs are efficient enforcers of the antitrust laws), or whether they have adequately alleged a relevant market.

for wrongful dishonor of a check or refusal to execute a funds transfer, Citibank argues that such a claim should also be dismissed (1) because it is time-barred; and (2) because Plaintiffs fail to allege that Citibank owed them any duty to conduct the requested transaction. (*See* Def. Br. at 6–8, 9 n.3). The Court analyzes these issues in turn.

### 1. Timeliness

Citibank argues that to the extent Plaintiffs assert a claim for wrongful dishonor or refusal to execute a funds transfer order, such a claim is barred by the three-year statute of limitations governing claims under Articles 4 and 4A of the New York Uniform Commercial Code. (Def. Br. at 9 n.3). In support of this argument, Citibank cites *Banca Commerciale Italiana, New York Branch v. N. Tr. Int'l Banking Corp.*, 160 F.3d 90 (2d Cir. 1998). *Banca Commerciale* held that claims concerning electronic funds transfers brought under N.Y. U.C.C. Article 4A are subject to a three-year statute of limitations. *Id.* at 95.

To the extent Plaintiffs seek relief under Article 4A based on Citibank's failure to execute a funds transfer, the Court would agree that such a claim is time-barred under *Banca Commerciale*, as Plaintiffs did not file their Complaint until July 2024, five years after Abbas and his co-Plaintiffs asked Citibank to make the transfer. However, in the Court's view, Plaintiffs' claim appears to implicate not (or at least not exclusively) Article 4A, but Article 4 of the N.Y. U.C.C, and specifically N.Y. U.C.C. § 4-402, entitled "Bank's Liability to Customer for Wrongful Dishonor." (*See* Compl. ¶¶ 140, 147).

19

The rule established in *Banca Commerciale* does not apply to claims brought under N.Y. U.C.C. Article 4, as the only claims in that case were brought under Article 4A. *See Banca Commerciale*, 160 F.3d at 93–95. And there is authority for the proposition that the limitations period applicable to a claim for wrongful dishonor under U.C.C. § 4-402, at least under U.C.C. regimes like the one adopted in New York,[9] depends on whether the claim sounds in tort or contract. As one commentator has noted, when interpreting cases brought under this provision, courts should "apply pre-existing non-Code statutes of limitations, applying the tort statute of limitations if wrongful dishonor is viewed as a tort, and applying the contract statute of limitations if wrongful dishonor is regarded as a breach of contract." 6C Anderson U.C.C. § 4-402:19 (3d. ed.); *see also Isis v. First Pa. Bank, N.A.*, No. Civ. 595C-76, 1977 WL 425591, at *3 (Terr. V.I. Dec. 23, 1977) (determining that wrongful dishonor claim under § 4-402 was within statute of limitations governing contract claims).

Plaintiffs' wrongful dishonor claim appears, as alleged, to sound in breach of contract. (*See* Compl. ¶ 176 (alleging that "BBAC and Citibank have a duty to adhere to their contractual obligations with the depositor [Abbas], including the facilitation of international transfers as agreed upon" and accepting "a domestic deposit"); *see also id.* ¶¶ 172–75). Claims for breach of contract under New York

---

[9] "Although the recommended Uniform Commercial Code contains UCC 4-111, which provides that any action arising out of Article 4 must be commenced within three years of the action's accrual, such provision has not been enacted by New York." *Samuel L. Hagan II, P.C. v. J.P. Morgan Chase Bank, N.A.*, 33 Misc. 3d 1211(A), 939 N.Y.S.2d 744, 2011 WL 4975311, at *11 n.5 (Sup. Ct. Kings Cnty. Oct. 19, 2011).

law are subject to a six-year statute of limitations.  N.Y. C.P.R.L. § 213(2).

Conversely, tort claims alleging injury to property are subject to a three-year

statute of limitations.  N.Y. C.P.R.L. § 214(4).

Accordingly, if read as bringing a claim for wrongful dishonor under § 4-402

sounding in contract, Plaintiffs' action may be timely.  Nonetheless, because the

claim requires dismissal on the merits, *see infra*, the Court need not definitively

decide now whether Plaintiffs' claim falls under Article 4 or Article 4A (or both) or,

if the former, what limitations period applies.

### 2.  Sufficiency of Plaintiffs' Allegations

Citibank alleges that however conceived, Plaintiffs' claims against Citibank

are fundamentally flawed because Citibank did not owe Plaintiffs any duty.  (Def.

Br. at 6–8).  Citibank argues that Plaintiffs were not their customers and banks do

not owe any duty to non-customers.  (*Id.* at 6–7).  Moreover, Citibank alleges that

correspondent banks do not owe a duty to process transactions for their foreign

bank's depositors, who have no property interest in the correspondent bank account.

(*Id.* at 7).  Since no Plaintiff alleges holding an account with Citibank at any time,

Citibank argues it owed no duty to process any transactions on Plaintiffs' behalf.

(*Id.* at 8).  Upon review, the Court finds that this argument requires dismissal of

Plaintiffs' wrongful dishonor claim.

Citibank is correct that it owed no general duty to Plaintiffs, who were not

Citibank customers.  "Generally, under New York law, '[a] bank owes no duty of

care to non-customers.'"  *XPO Enterp. Serv. Inc. v. Citibank, N.A.*, No. 23 Civ. 7518

21

(NCM) (JAM), 2025 WL 2233572, at *3 (E.D.N.Y. Aug. 5, 2025) (quoting *Targoff v. Wells Fargo Bank, N.A.*, 67 Misc.3d 504, 122 N.Y.S.3d 493, 497 (Sup. Ct. Westchester Cnty. 2020)); *see also Pedersen v. MidFirst Bank*, 527 F. Supp. 3d 188, 194 (N.D.N.Y. 2021) ("[P]laintiffs have not pleaded that they are customers of [the bank], and thus, [the bank] owe[d] plaintiffs no duty of care."); *Tzaras v. Evergreen Int'l Spot Trading, Inc.,* No. 01 Civ. 10726 (LAP), 2003 WL 470611, at *6 (S.D.N.Y. Feb. 25, 2003) ("The general rule is that a bank does not owe a duty to a non-customer third-party." (internal quotation marks omitted)).

Indeed, the text of § 4-402 specifically states that a "payor bank is liable to its *customer* for damages proximately caused by the wrongful dishonor of an item." N.Y. U.C.C. § 4-402 (emphasis added).  Section 4-104(1)(e) defines "customer" as "any person having an account with a bank or for whom a bank has agreed to collect items and includes a bank carrying an account with another bank."  *Id.* § 4-104(1)(e).  Plaintiffs do not allege that Abbas or the Plaintiff sellers held an account with Citibank; they admit they did not.  (Compl. ¶¶ 162–63).  And New York courts have long held that "[a] plaintiff lacks standing to bring an action against a bank pursuant to New York's UCC for wrongful dishonor of a check and in tort if it is not a 'customer' of a bank within the meaning of UCC § 4-402."  *Silber v. Provident N.Y. Bancorp.*, No 156065/2013, 2014 WL 6673691 (Sup. Ct. N.Y. Cnty. Nov. 21, 2014); *see also Scali v. Key Bank of New York, N.A.*, 203 A.D.2d 551, 611 N.Y.S.2d 21, 22 (2d Dep't 1994).

Nor do Plaintiffs plead facts plausibly suggesting that Citibank agreed to

22

honor Abbas's check or had any contractual duty to process transactions for him. Despite Plaintiffs' conclusory allegation that both "BBAC *and Citibank* have a duty to adhere to *their* contractual obligations with the depositor [*i.e.*, Abbas]" (Compl. ¶ 176; emphasis added), the only contractual arrangement described in the Complaint is Abbas's Term Deposit Agreement with BBAC.  (*See id.* ¶ 123).  Citibank is not alleged to have been a party to that agreement or to have entered into any other agreement or contract with Abbas or any of the other Plaintiffs.

Plaintiffs' theory seems to be that because Citibank was a correspondent bank for BBAC, Abbas somehow became Citibank's depositor or customer too and Citibank was obligated to carry out transactions on his behalf.  (*See id.* ¶¶ 163, 176).  But that theory is untenable as a matter of law.  "A correspondent bank account is a domestic bank account held by a foreign bank," *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 165 n.3 (2d Cir. 2013), and it is the foreign bank (here, BBAC) that has the right to direct transactions in the account. Correspondent banks have no obligation to process transactions for their foreign banks' depositors.  *See Grain Traders, Inc. v. Citibank, N.A.*, 960 F. Supp. 784, 791 (S.D.N.Y. 1997) (holding that a foreign bank's depositor had no right to enforce obligations involving a payment order processed through the foreign bank's U.S. correspondent account).  Nor do the foreign bank's customers have any property interest in or right to control the funds in a correspondent account.  *See Toisa Ltd. v. PT. Transamudra Usaha Sejahtera*, No. 13 Civ. 1407 (JMF), 2013 WL 12125701, at *13 (S.D.N.Y. Sept. 20, 2013) (stating that under New York law, "the customers

of a foreign bank generally have no property interest in a correspondent account that the bank maintains in the United States" and that "the funds belong to the foreign bank in whose name the account is held").

Accordingly, the Court recommends that Plaintiffs' wrongful dishonor claim be dismissed.

### C. Special Damages Claim

Citibank reads the Complaint as alleging the sixth cause of action for "Special Damages" as applicable to Citibank. (Def. Br. at 5; *see* Compl. ¶¶ 289–95). The Court does not necessarily agree. The cause of action for "Special Damages" does not specifically mention Citibank (Compl. ¶¶ 289–95), and instead is premised on Plaintiffs' allegations supporting its claims that BBAC converted and/or fraudulently conveyed the funds in Abbas's BBAC account (*id.* ¶¶ 290–92)—claims that are asserted only against Defendants BBAC and Assaf (*id.* ¶¶ 215–67). Moreover, the subsequent prayer for relief related to Plaintiffs' claim for "Special Damages" requests an award of damages only against BBAC and Assaf. (*Id.* at 43).

Be that as it may, Citibank argues that this claim should be dismissed because "special damages" are an element of certain causes of action, rather than a cause of action in and of itself. (Def. Br. at 13–14). The Court agrees that, to the extent the Complaint can be read as asserting a claim for special damages against Citibank, the claim should be dismissed.

"Special damages are those elements of damages that are the natural, but not the necessary or usual, consequence of the defendant's conduct, and typically stem

24

from and depend upon the particular circumstances of the case." 5A Wright & Miller, *Federal Practice and Procedure* § 1310 (4th ed.). A separate claim for special damages does not set forth a valid cause of action. *See, e.g., James v. United States Government*, No. 3:22cv18025-TKW-HTC, 2022 WL 22246977, at *1 (N.D. Fla. Dec. 13, 2022) (claims for, inter alia, "Compensatory and Special Damages" are "types of relief, not separate causes of action"); *Overseas Private Inv. Corp.*, No. 10 Civ. 7096 (RJS), 2012 WL 967458, at *9 (S.D.N.Y. Mar. 14, 2012) (dismissing claim for damages because it set forth merely an "item[] of special damages" rather than an "independent cause[] of action") (citation omitted); *Hammond v. Wal-Mart Stores, Inc.*, No. CV F 10-1788 (LJO) (DLB), 2011 WL 1668209, at *4 (E.D. Cal. May 2, 2011) ("Because [plaintiff's] 'special damages' cause of action fails to plead a cognizable legal theory, dismissal is proper pursuant to Fed. R. Civ. P. 12(b)(6)."). Accordingly, and because Plaintiffs have not alleged a valid cause of action against Citibank for violations of the antitrust laws or wrongful dishonor, they may not maintain a claim against Citibank for special damages.

### D. Attachment Claim

Finally, although Citibank does not explicitly address the point, the Court finds it necessary to discuss, and ultimately recommend dismissal of, Plaintiffs' fifth cause of action for "attachment" as applied to Citibank.[10] (Compl. ¶¶ 268–88 and at 43). Plaintiffs argue that they have "met the requirements for a prejudgment order

---

[10] Citibank's memorandum of law does, however, argue that Plaintiffs' "Complaint should be dismissed in its entirety as against Citibank with prejudice." (Def. Br. at 15). Hence, Plaintiffs were on notice that, to the extent they did intend their attachment claim to apply to Citibank, that claim might also not survive Citibank's motion to dismiss.

of attachment under CPRL 6201." (*Id.* ¶ 288). While it is unclear precisely what property Plaintiffs seek to attach, Plaintiffs allege that BBAC and Assaf maintain "correspondent bank accounts" in New York City, presumably referring, at least in part, to BBAC's correspondent account with Citibank. (*Id.* ¶¶ 275, 284, 288). However, if and to the extent Plaintiffs' attachment claim is directed at Citibank, it should be dismissed.

"[A]n order of attachment [under CPRL 6201] is a provisional remedy (not a cause of action for ultimate relief), which must be obtained by way of a motion, wherein the plaintiff must show, by affidavit and other written evidence, among other things, that it satisfies the grounds for an attachment." *L & L Auto Distributors & Suppliers Inc. v. Auto Collection, Inc.*, 23 Misc. 3d 1139(A), 889 N.Y.S.2d 883, 2009 WL 1652852, at *11 (Sup. Ct. Kings Cnty. June 12, 2009). Thus, just as a separate cause of action for special damages cannot be sustained against Citibank, neither can a separate cause of action for attachment. *See Spectre Air Cap., LLC v. WWTAI AirOpCo II DAC*, 737 F. Supp. 3d 195, 211 (S.D.N.Y. 2024) (dismissing claim for injunctive relief as an "injunction is a remedy, not a cause of action, and therefore can issue only on the basis of an independent claim for relief" (quoting *Pitcairn Props., Inc. v. LJL 33rd Street Assocs., LLC*, No. 11 Civ. 7318 (JSR), 2013 WL 705861, at *2 n.1 (S.D.N.Y. Feb. 21, 2013))). Accordingly, the Court recommends that Plaintiffs' claim for attachment be dismissed as against Citibank.

## CONCLUSION

For the above reasons, the Court recommends that Plaintiffs' complaint be

dismissed against Defendant Citibank, N.A. in its entirety.

**SO ORDERED.**

Dated:      New York, New York
            February 4, 2026

_____
GARY STEIN
United States Magistrate Judge

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. Section 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen days, inclusive of weekends and holidays, from service of this Report and Recommendation to file written objections thereto. *See also* Fed. R. Civ. 6(a)–(b), (d). Any such objections shall be filed with the Clerk of Court. Any request for an extension of time to file objections must be directed to the Honorable John P. Cronan. A failure to file timely objections will preclude appellate review. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).